1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,              No.  1:94-cr-05044-DAD-1

12                  Plaintiff,

13       v.                                 ORDER GRANTING DEFENDANT'S
                                            MOTION FOR COMPASSIONATE
14   GUADALUPE FAVELA,                      RELEASE UNDER 18 U.S.C. § 3582

15                  Defendant.              (Doc. Nos. 607, 609)

16

17          Pending before the court is defendant Guadalupe Favela's motion for a reduction of his

18   sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).  (Doc. Nos. 607, 609.)  The motion is based, in

19   part, on the purported risks posed to defendant by the coronavirus ("COVID-19") pandemic.  On

20   June 30, 2021, the court held a hearing on the motion and took it under submission.  (Doc. No.

21   642.)[1]  For the reasons explained below, defendant's motion will now be granted.

22   _____
     [1]  The undersigned apologizes for the excessive delay in the issuance of this order.  This court's
23   overwhelming caseload has been well publicized and the long-standing lack of adequate judicial
     resources in this district long-ago reached crisis proportion.  While that situation was partially
24   addressed by the U.S. Senate's confirmation of district judges for two of this court's vacancies on
     December 17, 2021 and June 21, 2022, another vacancy on this court with only six authorized
25   district judge positions was created on April 17, 2022.  For over twenty-two months the
     undersigned was left presiding over approximately 1,300 civil cases and criminal matters
26   involving 735 defendants.  That situation resulted in the court not being able to issue orders in
     submitted matters within an acceptable period of time and continues even now as the undersigned
27   works through the predictable backlog.  This has been frustrating to the court, which fully realizes
     how incredibly frustrating it is to the parties.
28
                                            1

**BACKGROUND**

On August 25, 1994, defendant Favela and his six co-defendants were charged in a second superseding indictment with the following:  one count of continuing a criminal enterprise in violation of 21 U.S.C. § 848; two counts of conspiracy to manufacture, distribute and possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 846 and 841(a)(1); one count of distribution of methamphetamine and aiding and abetting the same in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; one count of possession of methamphetamine with intent to distribute and aiding and abetting the same in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and one count of manufacturing methamphetamine and aiding and abetting the same in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  (Doc. No. 83; *see also* Doc. Nos. 609 at 3; 615 at 3.)[2]

On January 17, 1995, defendant's jury trial was commenced.  (Doc. No. 117.)  At that trial, the jury heard testimony that defendant Favela conspired with his co-defendants to manufacture and distribute large amounts of methamphetamine and that he ran a criminal enterprise to manufacture methamphetamine from 1991 to 1994, including operating a methamphetamine laboratory located on property he owned in Dunlap, California called the Millwood Road ranch.  (PSR at 5–6.)  Specifically, when California Department of Justice, Bureau of Narcotic Enforcement ("BNE") agents executed a search warrant at the Millwood Road ranch, they found liquid methamphetamine that a BNE criminal analyst determined would have produced 10–15 pounds of methamphetamine.  (*Id.* at 6–9.)  One of defendant Favela's co-defendants, Ramiro Ramirez, eventually cooperated with the government and testified at defendant's trial that he (Ramirez) had participated in six or seven methamphetamine "cooks" at the Millwood Road ranch and kept track of the number of reaction vessels used in each cook.  (*Id.* at 8.)  The trial court ultimately determined that approximately 224 pounds of methamphetamine

---

[2]  The initiating of this prosecution pre-dates the CM/ECF system that federal courts have now employed for many years.  In this case, aside from the electronic entry of court orders beginning in 1999, the first electronic entries do not begin to appear on the docket until the end of 2005. The undersigned has obtained a copy of the presentence report ("PSR") from the U.S. Probation Office and has relied in part upon that document for this background.  The court also notes that in 1995, presentence reports were not filed on the court's docket.

had been produced at the Millwood Road ranch during just a portion of the criminal enterprise's activity that, in total, covered three years. (*Id.* at 8, 10–11.) Defendant Favela derived substantial income from this drug manufacturing and trafficking activity and used large amounts of the cash made from the manufacture and distribution of methamphetamine to purchase real estate. (*Id.* at 5–6.)

On February 2, 1995, following a ten-day trial, the jury found defendant Favela guilty on all counts. (Doc. Nos. 139, 142.) According to the presentence report prepared in preparation for his sentencing, defendant Favela continued to deny any participation in the crime of conviction, maintained that he did not know that anything was going on at the ranch, and that he wanted the court to know that co-defendant Ramirez had lied during his testimony before the jury. (PSR at 9.) Following his conviction, it was determined that under the U.S. Sentencing Guidelines then in effect, defendant Favela's total offense level was 43 and his criminal history category was I, resulting in a sentencing guideline range calling for a sentence of life imprisonment. (PSR at 12–13.) On July 31, 1995, the court adopted the PSR's recommendation and sentenced defendant to life imprisonment as to count one, life imprisonment as to counts two through six with those terms to run concurrently with each other and to the life sentence imposed as to count one and to any other federal or state sentence imposed upon defendant Favela, and a $300 mandatory special assessment. (Doc. Nos. 322; 327.)[3]

In 1998 defendant Favela filed a motion pursuant to 28 U.S.C. § 2255 seeking to vacate, set aside or correct his sentence (Doc. No. 492), which he supplemented or amended several times (Doc. Nos. 510, 517, 518, 531.) The then-assigned district judge denied that § 2255 motion on January 24, 2000. (Doc. No. 532.) Following the Sentencing Commission's promulgation of Amendment 782, which generally revised the drug quantity table and chemical quantity tables and which applied retroactively to previously sentenced defendants, on June 18, 2015, defendant Favela filed a motion seeking a reduction of his sentence under 18 U.S.C. § 3582(c)(2), U.S.S.G.

---

[3] After defendant appealed from his judgment of conviction, on May 15, 1997, the Ninth Circuit vacated the convictions on the two conspiracy counts, 2 and 5, as duplicative of the continuing criminal enterprise conviction. (Doc. No. 467; *United States v. Favela*, 1997 U.S. App. LEXIS 6696, *3 (9th Cir. April 8, 1997).

§ 1B1.10(b)(1), and Amendment 782.  (Doc. No. 597.)  The then-assigned district judge denied

that motion, concluding that "the amount of methamphetamine attributable to Defendant is 224

pounds, which is considerably greater than the minimum amount to subject a defendant to a base

offense level of 38, even after Amendment 782 is taken into account."  (Doc. No. 604 at 3.)

Thus, the court at that time found that "[i]n conjunction with his criminal history category of I,

the two-level increase pursuant to § 2D1.1(b)(1), and the four-level increase under § 2D1.5(a), the

applicable sentence guideline is life imprisonment, which is the same as the previous range

applicable to his case before Amendment 782 took effect."  (*Id.* at 4.)  As a result, the court

determined that "defendant's sentence was not 'based on a sentencing range that has been

subsequently lowered by the Sentencing Commission,' as required by 18 U.S.C. § 3582(c)(2)."

(*Id.*) (citing *United States v. Leniear*, 574 F.3d, 668, 673 (9th Cir. 2009)).

      Nevertheless, in denying defendant's motion seeking a reduction of his sentence in

November 2015, the then-assigned district judge noted:

> Although the Court is without authority to reduce Defendant's
> sentence, the Court commends Defendant for the impressive efforts
> he has taken towards self-improvement, and his many
> accomplishments while in prison, which include completing several
> educational and lifestyle courses, mentoring his fellow inmates,
> engaging in various volunteer activities, providing financial support
> to his family members, becoming proficient in English, and earning
> his GED.  The Court's denial of the instant motion is in no way a
> reflection of Defendant's character, but is a matter of law.

(*Id.*)

      Today, defendant remains in the custody of the U.S. Bureau of Prisons ("BOP") and is

serving his life sentence at Federal Correctional Institution, Victorville Medium I ("FCI

Victorville Medium I").  (Doc. No. 609 at 2.)  On May 5, 2020, defendant filed a *pro se* motion

seeking a reduction of his sentence and his immediate release pursuant to 18 U.S.C.

§ 3582(c)(1)(A).  (Doc. No. 607.)  The court referred defendant's motion to the Federal

Defender's Office ("FDO") for this district.  (Doc. No. 608.)  On July 6, 2020, the FDO filed a

supplemental motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) on behalf of

defendant.  (Doc. No. 609.)  While defendant's motion was pending, he contracted COVID-19 in

July 2020.  (Doc. Nos. 615 at 7, 9; 622 at 3.)  The government filed its opposition to the pending

1   motion on August 6, 2020, and on September 3, 2020, defendant filed his reply thereto.  (Doc.

2   Nos. 615, 622.)

3       As noted, the court held a hearing on the pending motion on June 30, 2021.  (Doc. No.

4   642.)  To address inquires raised by the court at that hearing, defendant filed updated medical

5   records and a supplemental brief on July 1, 2021.  (Doc. Nos. 643, 647, 648.)

6                                   **LEGAL STANDARD**

7       A court generally "may not modify a term of imprisonment once it has been imposed."

8   18 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment

9   of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may

10  not be modified by a district court except in limited circumstances.").  Those limited

11  circumstances include compassionate release in extraordinary cases.  *See United States v. Holden*,

12  452 F. Supp. 3d 964, 968 (D. Or. 2020).  Prior to the enactment of the First Step Act of 2018

13  ("the FSA"), motions for compassionate release could only be filed by the BOP.  18 U.S.C.

14  § 3582(c)(1)(A) (2002).  Under the FSA, however, imprisoned defendants may now bring their

15  own motions for compassionate release in the district court.  18 U.S.C. § 3582(c)(1)(A) (2018).

16  In this regard, the FSA specifically provides that a court may

17          upon motion of the defendant after the defendant has fully exhausted
            all administrative rights to appeal a failure of the [BOP] to bring a
18          motion on the defendant's behalf[4] or the lapse of 30 days from the
            receipt of such a request by the warden of the defendant's facility,
19          whichever is earlier, may reduce the term of imprisonment (and may
            impose a term of probation or supervised release with or without
20          conditions that does not exceed the unserved portion of the original
            term of imprisonment), after considering the factors set forth in [18
21          U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that
            —
22
23          (i)     extraordinary   and   compelling   reasons   warrant   such   a
                    reduction; or

24  [4]  If the BOP denies a defendant's request within 30 days of receipt of such a request, the
    defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the
25  date the Warden signed the response." 28 C.F.R. § 542.15(a).  If the regional director denies a
    defendant's administrative appeal, the defendant must appeal again to the BOP's "General
26  Counsel within 30 calendar days of the date the Regional Director signed." *Id.*  "Appeal to the
    General Counsel is the final administrative appeal." *Id.*  When the final administrative appeal is
27  resolved, a defendant has "fully exhausted all administrative rights." *See* 18 U.S.C.
    § 3582(c)(1)(A).
28

                                            5

1
2
3
4

  (ii)  the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

5
6

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

7 18 U.S.C. § 3582(c)(1)(A)(i) and (ii).

8    The applicable policy statement with respect to compassionate release in the U.S.

9 Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and

10 compelling reasons."  U.S. Sent'g Guidelines Manual ("U.S.S.G.") § 1B1.13 (U.S. Sent'g

11 Comm'n 2018)[5]; *see also United States v. Gonzalez*, 451 F. Supp. 3d 1194, 1197 (E.D. Wash.

12 2020) (noting that many courts have relied on U.S.S.G. § 1B1.13 to define "extraordinary and

13 compelling reasons," even though that policy statement was issued before Congress passed the

14 FSA and authorized defendants to file compassionate release motions).  However, the Ninth

15 Circuit has held "that the current version of U.S.S.G. § 1B1.13 is not an 'applicable policy

16 statement[ ]' for 18 U.S.C. § 3582(c)(1)(A) motions filed by a defendant."  *United States v.*

17 *Aruda*, 993 F.3d 797, 802 (9th Cir. 2021).  "In other words, the Sentencing Commission has not

18 yet issued a policy statement 'applicable' to § 3582(c)(1)(A) motions filed by a defendant."  *Id.*

19 The Ninth Circuit clarified that "[t]he Sentencing Commission's statements in U.S.S.G. § 1B1.13

20 may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but they

21 are not binding."  *Id.* (citing *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020)).

22    In so holding, the Ninth Circuit joined the five other circuits who have addressed this

23 issue and have unanimously held "that U.S.S.G. § 1B1.13 only applies to § 3582(c)(1)(A)

24 motions filed by the BOP Director, and does not apply to § 3582(c)(1)(A) motions filed by a

25
26
27
28

[5]  According to U.S.S.G. § 1B1.13(2), to be granted a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).  However, as the Ninth Circuit has clarified, "[t]his dangerousness finding is not statutorily required under 18 U.S.C. § 3582(c)(1)(A)(i), but [it] is part of the Sentencing Commission's policy statement in U.S.S.G. § 1B1.13(2)."  *United States v. Aruda*, 993 F.3d 797, 799 (9th Cir. 2021).

1   defendant." *Id.*; *see, e.g.*, *United States v. Brooker (Zullo)*, 976 F.3d 228, 237 (2d Cir. 2020)

2   ("[T]he First Step Act freed district courts to consider the full slate of extraordinary and

3   compelling reasons that an imprisoned person might bring before them in motions for

4   compassionate release.  Neither Application Note 1(D), nor anything else in the now-outdated

5   version of Guideline § 1B1.13, limits the district court's discretion."); *United States v. Jones*, 980

6   F.3d 1098, 1111 (6th Cir. 2020) ("In cases where incarcerated persons file motions for

7   compassionate release, federal judges may skip step two of the § 3582(c)(1)(A) inquiry and have

8   full discretion to define 'extraordinary and compelling' without consulting the policy statement

9   § 1B1.13."); *Gunn*, 980 F.3d at 1181 ("[T]he Guidelines Manual lacks an 'applicable' policy

10  statement covering prisoner-initiated applications for compassionate release.  District judges must

11  operate under the statutory criteria—'extraordinary and compelling reasons'—subject to

12  deferential appellate review."); *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020) ( "In

13  short, we agree with the Second Circuit and the emerging consensus in the district courts:  There

14  is as of now no 'applicable' policy statement governing compassionate-release motions filed by

15  defendants under the recently amended § 3582(c)(1)(A), and as a result, district courts are

16  'empowered . . . to consider any extraordinary and compelling reason for release that a defendant

17  might raise.'") (citation omitted); *United States v. Maumau*, 993 F.3d 821, 837 (10th Cir. 2021)

18  ("We therefore agree with the district court that under the second part of § 3582(c)(1)(A)'s test,

19  its finding that extraordinary and compelling reasons warranted a reduction in Maumau's case

20  was not constrained by the Sentencing Commission's existing policy statement, U.S.S.G.

21  § 1B1.13.").

22      It is now settled that "[i]n the absence of an applicable policy statement from the

23  Sentencing Commission, the determination of what constitutes extraordinary and compelling

24  reasons for sentence reduction lies squarely within the district court's discretion." *United States*

25  *v. Chen*, __ F.4th __, No. 20-50333, 2022 WL 4231313, at *3 (9th Cir. Sept. 14, 2022).  As the

26  Supreme Court has recently held, "[i]t is only when Congress or the Constitution limits the scope

27  of information that a district court may consider in deciding whether, and to what extent, to

28  /////

7

1  modify a sentence, that a district court's discretion to consider information is restrained."

2  *Concepcion v. United States*, __ U.S. __, 142 S. Ct. 2389, 2396 (2022).

3         In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the

4  defendant bore the initial burden of demonstrating that a sentence reduction was warranted.  *See*

5  *United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998).  Although the Ninth Circuit

6  has not specifically addressed the question of which party bears the burden in the context of a

7  motion for compassionate release brought pursuant to § 3582(c) as amended by the FSA, district

8  courts to have done so agree that the burden remains with the defendant.  *See, e.g.*, *United States*

9  *v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, *1 (C.D. Cal. Jan. 31, 2020); *United*

10  *States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, *3 (W.D. Wash. May 7, 2020).

11                                    **ANALYSIS**

12         As district courts have summarized, in analyzing whether a defendant is entitled to

13  compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a

14  defendant has satisfied three requirements:

15                 First, as a threshold matter, the statute requires defendants to exhaust
                   administrative remedies.   18 U.S.C. § 3582(c)(1)(A).   Second, a
16                 district court may grant compassionate release only if "extraordinary
                   and compelling reasons warrant such a reduction" and "that such
17                 reduction is consistent with applicable policy statements issued by
                   the Sentencing Commission." *Id.*  Third, the district court must also
18                 consider "the factors set forth in Section 3553(a) to the extent that
                   they are applicable." *Id.*
19

20  *United States v. Rodriguez*, 424 F. Supp. 3d 674, 680 (N.D. Cal. 2019); *see also United States v.*

21  *Parker*, 461 F. Supp. 3d 966, 970 (C.D. Cal. 2020); *United States v. Trent*, No. 16-cr-00178-

22  CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9, 2020) (noting that as to the third factor,

23  release must be "consistent with" the sentencing factors set forth in § 3553(a)).

24  **A.      Administrative Exhaustion**

25         Here, the parties do not dispute that defendant has exhausted his administrative remedies

26  prior to filing his pending § 3582 motion.  (Doc. Nos. 609 at 5–6; 615 at 4.)  Accordingly, the

27  court will turn to the merits of defendant Favela's pending motion.

28  /////

                                          8

**B.** **Extraordinary and Compelling Reasons**

According to the Sentencing Commission's policy statement, "extraordinary and compelling reasons" warranting compassionate release may exist based on a defendant's medical conditions, age and other related factors, family circumstances, or "other reasons." U.S.S.G. § 1B1.13, cmt. n.1 (A)–(D). Even though the catch-all of "other reasons" was included in the policy statement at a time when only the BOP could bring a compassionate release motion, and that policy statement "is not an 'applicable policy statement' for 18 U.S.C. § 3582(c)(1)(A) motions filed by a defendant," courts have agreed that defendants may support their own motions for reductions in their sentence under the FSA by asserting extraordinary and compelling reasons exist based on "other reasons." *Aruda*, 993 F.3d at 802 ("The Sentencing Commission's statements in U.S.S.G. § 1B1.13 may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but they are not binding."); *see also United States v. Kesoyan*, No. 2:15-cr-00236-JAM, 2020 WL 2039028, at *3–4 (E.D. Cal. Apr. 28, 2020) (collecting cases).

In the pending motion, defendant Favela argues that extraordinary and compelling reasons warranting his compassionate release exist on two independent grounds: (1) his medical conditions in combination with the risks posed to him by the COVID-19 pandemic, and (2) "other reasons" due to his sentence of life imprisonment having been imposed under a now-defunct, unconstitutional mandatory sentencing regime. The court will address each ground in turn.

1.   Medical Conditions Warranting Compassionate Release

The medical condition of a defendant may warrant the granting of compassionate release by the court where the defendant "is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). Non-exhaustive examples of terminal illnesses that may warrant compassionate release "include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." *Id.* In addition to terminal illnesses, a defendant's debilitating physical or mental condition may warrant compassionate release, including when:

/////

9

The defendant is

(I)   suffering from a serious physical or medical condition,

(II)  suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id*. at cmt. n.1(A)(ii).  Where a defendant has moderate medical issues that otherwise might not be sufficient to warrant compassionate release under ordinary circumstances, many courts have concluded that the risks posed by COVID-19 may tip the scale in favor of release when the particular circumstances of a case are considered in their totality.  *See, e.g.*, *Parker*, 461 F. Supp. 3d at 980 ("Since the onset of the COVID-19 pandemic, courts have determined that inmates suffering from conditions such as hypertension and diabetes are now at an even greater risk of deteriorating health, presenting 'extraordinary and compelling' circumstances that may justify compassionate release.") (collecting cases); *United States v. Rodriguez*, 451 F. Supp. 3d 392, 405 (E.D. Pa. 2020) ("Without the COVID-19 pandemic—an undeniably extraordinary event—Mr. Rodriguez's health problems, proximity to his release date, and rehabilitation would not present extraordinary and compelling reasons to reduce his sentence.  But taken together, they warrant reducing his sentence.").

Compassionate release may also be warranted based on a defendant's age and other related factors.  Thus, "extraordinary and compelling reasons" exist where a "defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less."  U.S.S.G. § 1B1.13, cmt. n.1(B).  This provision does not apply

/////

/////

/////

/////

1   here because, although defendant Favela has effectively served a term of nearly 33 years in

2   prison, he is currently only 59 years old.  (Doc. No. 609 at 7, 11.)[6]

3          Defendant Favela argues that extraordinary and compelling reasons warranting his

4   compassionate release exist because he "is a diabetic who suffers from high blood pressure," and

5   the Centers for Disease Control and Prevention ("CDC") has recognized that both of these

6   chronic medical conditions increase his risk of suffering serious illness or death if he were to

7   contract COVID-19.  (Doc. No. 609 at 1–2.)  According to defendant, his blood pressure and

8   type-2 diabetes have not been well controlled in recent years; as reflected in his medical records,

9   defendant's hemoglobin A1C was "markedly elevated" and his blood pressure was sustained at

10  elevated levels throughout June of 2020, and his random blood sugar tests show that his blood

11  sugar was often high in 2021.  (*Id.* at 7; Doc. Nos. 643 at 2; 648 at 2.)  In addition, defendant

12  takes a statin drug and low dose aspirin for his high cholesterol and acetaminophen for shoulder

13  pain that has persisted over 8 months, and he is "currently considered overweight with a BMI of

14  29."  (Doc. No. 609 at 7.)

15         The government agrees that defendant's diabetes "is a serious, chronic health condition

16  that the CDC recognizes increases the risk of severe illness from COVID-19, a condition from

17  which defendant 'is not expected to recover,' and which—in the presence of COVID-19—may be

18  both 'serious' and 'substantially diminish[] the ability of the defendant to provide self-care . . ..'"

19  (Doc. No. 615 at 7.)  However, the government argues that defendant Favela is able to self-care in

20  custody and his diabetic condition did not result "in dangerous complications (or any

---

21  [6]  In determining a defendant's projected release date, courts may take into account any "good
22  time credits" awarded to the defendant by BOP for "exemplary" behavior in prison as set forth in
    18 U.S.C. § 3624(b)(1).  *See, e.g.*, *United States v. Burrill*, No. 17-cr-00491-RS, 2020 WL
23  1846788, at *1 n.1 (N.D. Cal. Apr. 10, 2020).  Defendant Favela asserts in his motion that
    although he is serving a life sentence and is thus not awarded good time credits, he "has served
24  nearly 318 months in prison without a disciplinary incident," and if eligible, he "would be
    credited with having satisfied a sentence of more than 30 years."  (Doc. Nos. 609 at 2; 622 at 2.)
25  The court believes that defendant's estimate was accurate at the time he filed his motion and
    reply.  Given the delay in the court's issuance of this order, the court has now calculated that as of
26  September 23, 2022, defendant Favela has served 28 years, 6 months, and 21 days (approximately
    336.5 months).  (*See* Doc. No. 615-1 at 4.)  Accounting for good time credits of 54 days for every
27  year served, defendant would have accrued 1,539 days of good time credit, meaning that
    defendant has effectively served approximately 387.1 months (nearly 33 years) in federal prison.
28

11

1   complications)" since he tested positive for COVID-19 on July 16, 2020.  (*Id.* at 7, 9.)  According

2   to the government, defendant has not suffered any symptoms since testing positive for COVID-

3   19.  (*Id.* at 9.)  Moreover, the government argues that to the extent defendant's diabetes is not

4   well controlled, that is due to his refusal to take insulin as recommended by his doctors to better

5   control his diabetes.  (*Id.* at 9.)  In any event, the government contends that none of defendant

6   Favela's expressed fears related to COVID-19 have come to pass because "even with his

7   combination of health concerns and [then-]age of 57, [his] infection [with COVID-19] has not

8   result[ed] in serious complications," and BOP medical staff responded quickly and continually

9   monitor him while he was in isolation.  (*Id.* at 12.)

10      In reply, defendant vehemently disagrees with the government's characterization of his

11   diabetes treatment and his experience since having contracted COVID-19.  (Doc. No. 622 at 1.)[7]

12   First, defendant asserts that the government has misinterpreted his medical records in concluding

13   that he requires insulin and is refusing to take it.  (*Id.* at 2.)  Defendant explains that he has

14   actually been treated for several years as a non-insulin dependent diabetic, pointing to his medical

15   record "noting non-insulin dependent status on March 5, 2020," and that it was not until June 11,

16   2020 that a doctor recommended that he begin taking insulin injections.  (*Id.*)  Defendant further

17   explains that he did not outright refuse to do so, but rather asked to wait to see if he could lose

18   weight and bring his hemoglobin A1C levels down to acceptable levels, and that if his effort was

19   unsuccessful in this regard, then he is willing to take insulin injections.  (*Id.*)  Second, defendant

20   asserts that his infection was not asymptomatic; he actually "suffered numerous significant effects

21   from what [he] believes was a COVID-19 infection from June 23, 2020 to July 12, 2020."  (*Id.* at

22   3.)  These symptoms included fever and body aches beginning on June 23, 2020, then loss of

23   smell and taste and pain when brushing his teeth by July 3, 2020, then three days of diarrhea,

24

25   [7]  The facts stated in defendant's reply brief were relayed to defense counsel by defendant Favela
    on August 21, 2020.  (Doc. No. 622 at 2 n.1.)  Those facts are attested to in a declaration that
26   counsel prepared on defendant's behalf and sent to defendant for his signature.  (*Id.*)  However, as
    of the date of filing the reply brief, defendant's counsel had not received the signed declaration
27   back.  (*Id.*)  Counsel represented to the court that the declaration would be filed as soon as
    counsel receives it.  (*Id.*)  On December 3, 2020, counsel apologized for the delay and filed
28   defendant's executed declaration.  (Doc. Nos. 623, 623-1.)

1   blurred vision, five to six days of hallucinations, and he was coughing so hard he could not breath

2   properly.  (*Id.*)  Defendant does not have access to a scale, but he believes he has lost a great deal

3   of weight as a result of suffering from these other symptoms, which lasted until July 12, 2020

4   when he finally felt well enough to start eating again.  (*Id.*)  According to defendant, there are no

5   medical records for him during this period of time "because no one at the prison treated him

6   during his illness or asked about past symptoms once they tested him for COVID-19 [on July 14,

7   2020] and learned he was positive for the coronavirus."  (*Id.*)

8        Defendant also explains in his reply that he was never told the results of his COVID-19

9   test, but that on July 16, 2020, he was transferred by prison staff without explanation to an

10  isolation unit for 21 days.  (*Id.* at 3.)  While in isolation, defendant was assessed by medical staff

11  and he did not at that time have any of the listed COVID-19 symptoms, but the staff never asked

12  him how he had been doing before being placed in isolation.  (*Id.* at 3–4.)  After being moved out

13  of isolation, defendant ordered refills on his prescription medication, but before receiving them,

14  he was moved back to the isolation unit at some unspecified date for reasons not known to him.

15  (*Id.* at 4.)  Defendant's order for his prescription medication refills "did not follow him back into

16  the isolation unit" so he reordered his medication again on August 12, 2020, but as of August 21,

17  2020, he represents that he had been without his medication since August 17, 2020.  (*Id.*)  In

18  defendant's declaration, which he signed on September 24, 2020, he clarified that he started

19  receiving his medication again on August 23, 2020.  (Doc. No. 623-1 at 3.)

20       In addition to his concerns regarding access to his medications, defendant Favela contends

21  that because he has been moved back into the isolation unit at FCI Victorville Medium I, which

22  houses other inmates who "are suspected of being COVID-19 positive or ill with the

23  coronavirus," he now faces an even "greater risk of re-exposure and a new infection."  (Doc. No.

24  622 at 4.)  Moreover, defendant asserts that he has been experiencing episodes of breathing

25  difficulties (racing heart and finding it hard to breathe lasting about five minutes) more frequently

26  than he had before contracting COVID-19.  (*Id.*)  Defendant represents that he previously

27  experienced these episodes occasionally, but now experiences them every night, up to three times

28  a night.  (*Id.*)  In short, defendant argues that extraordinary and compelling reasons exist here

13

1    because "he remains at a more heightened risk of reinfection without any medication for his

2    underlying health conditions and without knowing whether the first COVID-19 infection caused

3    him serious ongoing damage." (*Id.* at 8.)

4            In light of all of the above, the court finds that defendant Favela does suffer from serious

5    medical conditions, including type-2 diabetes and high blood pressure (hypertension), which

6    place him at a higher risk of becoming seriously ill if he were to be re-infected by COVID-19.

7    *See People with Certain Medical Conditions*, U.S. Centers for Disease Control and Prevention,

8    https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-

9    conditions.html (last reviewed September 18, 2022).  Although defendant's motion was initially

10   made based on the risks allegedly posed to him if he became infected with COVID-19, his motion

11   and the relief he seeks are not rendered moot merely because he has since contracted COVID-19

12   and appears to have recovered—whether his case was asymptomatic as the government contends

13   or significantly symptomatic as defendant recounts.  "Without scientific conclusions as to

14   whether reinfection is possible or how long COVID-19 immunity lasts, [courts have] err[ed] on

15   the side of caution to avoid potentially lethal consequences."  *States v. Yellin*, No. 3:15-cr-3181-

16   BTM-1, 2020 WL 3488738, at *13 (S.D. Cal. June 26, 2020).  Accordingly, the court finds

17   defendant's fear of reinfection and the potential consequences to him to be well-placed.

18   Nevertheless, the court does not find that defendant's medical conditions constitute compelling or

19   extraordinary reasons supporting his compassionate release here.

20           First, defendant has not provided the court with any basis upon which to find that FCI

21   Victorville Medium I failed to provide him adequate and appropriate medical care and treatment

22   with regard to his symptomatic COVID-19 infection in July 2020, and his diabetes care generally.

23   Importantly, defendant Favela's medical records reflect that he received the first and second dose

24   of the Moderna COVID-19 vaccine in January and February 2021, respectively.  (Doc. No. 639 at

25   2—sealed.)  According to the CDC, COVID-19 vaccines, like the Moderna vaccine that

26   defendant received, "are effective at protecting people from getting seriously ill, being

27   hospitalized, and dying."  *See Stay Up to Date with COVID-19 Vaccines Including Boosters*, U.S.

28   Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-

ncov/vaccines/stay-up-to-date.html (updated Sept. 8, 2022).  This remains true even for individuals who have recovered from a COVID-19 infection.  *See id.* ("Getting a COVID-19 vaccine after you recover from COVID-19 infection provides added protection against COVID-19.")  At this point, medical evidence strongly suggests that fully vaccinated individuals are very well protected against becoming severely ill from COVID-19, and courts have routinely considered an individual's vaccination status when ruling on compassionate release motions.[8] *See United States v. Pigford*, No. 2:20-cr-00414-MAK, 2022 WL 2019978, at *4 (E.D. Pa. June 6, 2022) (denying motion for compassionate release and noting that "[i]t is also well-settled COVID-19 vaccinations 'are highly effective at preventing infection and . . . at reducing the severity of symptoms' from COVID-19 and its presently known variants"); *United States v. Johnson*, No. 18-cr-578-KM, 2022 WL 901468, at *4 (D.N.J. Mar. 28, 2022) (citing CDC guidance and noting that "[COVID-19] vaccines are highly effective at preventing infection and, when breakthrough infections occur, at reducing the severity of symptoms," and "[t]he wide availability of vaccines tends to render the COVID-19 risk less extraordinary or compelling"); *United States v. Gatson*, No. 13-cr-705-WJM, 2022 WL 1269785, at *2 (D.N.J. Apr. 28, 2022) (same); *United States v. Hannigan*, No. 2:19-cr-373, 2022 WL 815449, at *15 (E.D. Pa. Mar. 17, 2022) ("Even in the era of the highly transmissible omicron variant, Moderna vaccination and

---

[8]  The court recognizes that the meaning of "fully vaccinated" has changed over time as the CDC's recommendations have evolved to include vaccination "boosters" in addition to the initial vaccination "primary series."  *See Vaccines for COVID-19*, U.S. Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/index.html (last reviewed Sept. 18, 2022).  Indeed, the CDC currently recommends staying "up to date" with vaccinations, meaning that individuals receive "all primary series doses and [monovalent and bivalent] boosters for their age group."  *See Stay Up to Date with COVID-19 Vaccines Including Boosters*, U.S. Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/stay-up-to-date.html. The court is not aware whether defendant Favela was offered or received a booster vaccination, though according to BOP's website, "[i]nmates have also been offered booster shots in accordance with CDC guidance."  *See* https://www.bop.gov/coronavirus/ (last accessed Sept. 18, 2022).  The CDC's guidance in this regard is that "[c]orrectional and detention facilities should  ensure that vaccines and boosters are available for all residents and staff in order to stay up to date."  *See Guidance on Prevention and Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, U.S. Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (updated May 3, 2022).

booster shot is highly effective against severe illness.").  Indeed, courts have routinely denied

motions for compassionate release even where brought fully vaccinated individuals who suffer

from chronic medical conditions that increase their risk of severe illness or death from COVID-19

infection.  *See  United States v. Willis*, No. 3:15-cr-00465-BR, 2021 WL 2179256, at *3-4 (D. Or.

May 27, 2021) (concluding that federal prisoners who have been fully vaccinated but suffer from

chronic medical conditions that would put them at serious risk of severe illness from COVID-19

do not satisfy the extraordinary and compelling standard for compassionate release) (citing

cases); *United States v. Grummer*, 519 F. Supp. 3d 760, 763 (S.D. Cal. 2021) ("Although

Defendant suffers from several chronic medical conditions, his vaccination significantly mitigates

the risk that he will contract COVID-19.  Other courts to address the issue have reached similar

conclusions."); *United States v. Ballenger*, No. 3:16-cr-5535-BHS, 2021 WL 308814, at *5 (W.D.

Wash. Jan. 29, 2021) ("[B]ecause [defendant] has already been infected and vaccinated, his

chronic medical conditions alone do not amount to an extraordinary and compelling reason to

warrant compassionate release.").

Second, the court is not persuaded by defendant's argument that the court should discount

the weight given to his vaccination status because he may be immunocompromised due to his

diabetes.  Defendant raised this argument in passing at the June 30, 2021 hearing and supported

the argument in his supplemental brief by citing to an article in a medical journal for the

proposition that the efficacy and longevity of COVID-19 vaccines in diabetics is unknown.  (Doc.

No. 643 at 2–4.)  However, the authors of the journal article cited by defendant had concluded

from their review of relevant literature that patients with diabetes mellitus ("DM") should be

prioritized for vaccination because "clinical data support[ed] a robust neutralizing antibody

response in COVID-19 patients with DM."  (Doc. No. 643 at 3; *see* R. Pal, S. Kumar Bhadada, A.

Misra, *COVID-19 vaccination in patients with diabetes mellitus: Current concepts, uncertainties

and challenges*, Elsevier, Volume 15, Issue 2, March–April 2021).  That is, the focus of their

article was on whether relevant literature supported prioritizing diabetics in the initial distribution

of COVID-19 vaccines.  The authors did not address booster vaccinations in that article, which is

not surprising given that the article was submitted for review on February 15, 2021 and was

published in the March–April 2021 issue of that journal.  (*Id.*)  Thus, defendant's citation to this

article does little to advance his argument that he may be immunocompromised.  Notably, the

CDC does not list "diabetics" as an example of individuals who are immunocompromised,[9] and in

any event, the CDC's specific guidance for individuals who are "moderately or severely

immunocompromised" is to stay up to date on COVID-19 vaccinations, even though the

"immune response to COVID-19 vaccination may not be as strong as in people who are not

immunocompromised."  *See COVID-19 Vaccines for People Who Are Moderately or Severely*

*Immunocompromised*, U.S. Centers for Disease Control and Prevention,

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/immuno.html (updated

Sept. 14, 2022).

Third, the court recognizes that while defendant's motion has been pending, rates of

COVID-19 infection at FCI Victorville Medium I over the past two years have fluctuated, as have

national rates of COVID-19 infections, with the ebbs and flows of variants and the distribution of

vaccines and boosters.  According to BOP's website, as of the date of the issuance of this order,

---

[9]  According to the CDC:

> People are considered to be moderately or severely immunocompromised (have a weakened immune system) due to several types of conditions and treatments.  Examples include:
>
> - Been receiving active cancer treatment for tumors or cancers of the blood
> - Received an organ transplant and are taking medicine to suppress the immune system
> - Received chimeric antigen receptor (CAR)-T-cell therapy (a treatment to help your immune system attach to and kill cancer cells) or received a stem cell transplant (within the last 2 years)
> - Moderate or severe primary immunodeficiency (such as DiGeorge syndrome, Wiskott-Aldrich syndrome)
> - Advanced or untreated HIV infection
> - Active treatment with high-dose corticosteroids or other drugs that may suppress the immune response.

*See COVID-19 Vaccines for People Who Are Moderately or Severely Immunocompromised*, U.S. Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/immuno.html (updated Sept. 14, 2022).

1   the overall COVID-19 statistics for FCI Victorville Medium I are as follows:  3 inmate deaths, 1

2   staff death, 526 inmates have recovered from COVID-19 infections, and 136 staff have recovered

3   from COVID-19 infections.  *See* https://www.bop.gov/coronavirus/ (last accessed Sept. 22,

4   2022).  The court notes in particular that, as of September 22, 2022, there are no confirmed active

5   inmate COVID-19 cases and only two confirmed active staff COVID-19 infections at FCI

6   Victorville Medium I.  (*Id.*)  Thus, the current conditions at FCI Victorville Medium I do not at

7   all suggest that extraordinary and compelling reasons exist based on the risks posed to defendant

8   by COVID-19 in that particular facility.  *See also United States v. Gil*, No. 90-cr-306-KMW,

9   2022 WL 4245072, at *2 (S.D.N.Y. Sept. 15, 2022) ("Since Gil filed his first motion, however,

10   the threat from COVID-19 has diminished nationwide and within the BOP," and "[t]here are

11   currently only three confirmed active cases of COVID at FCC Victorville, the facility at which

12   Gil is housed, and the facility has implemented safety measures to reduce the risk of infection.").

13        Accordingly, the court concludes that defendant Favela has not demonstrated that his

14   medical conditions, even in combination with the COVID-19-related conditions at FCI

15   Victorville Medium I, support a finding that his ability to provide self-care within the prison

16   setting has been substantially diminished.  Thus, defendant has not shown that his medical

17   conditions constitute extraordinary and compelling reasons for compassionate release under

18   § 3582(c)(1)(A).

19        2.     <u>"Other Reasons" Warranting Compassionate Release</u>

20        As noted above, the Sentencing Commission's policy statement—U.S.S.G. § 1B1.13—

21   sets forth the circumstances that constitute extraordinary and compelling reasons warranting

22   compassionate release under 18 U.S.C. § 3582(c) when motions are brought by the BOP Director.

23   However, when ruling on § 3582(c)(1)(A) motions brought by defendants, district courts may use

24   that policy statement to inform their discretion in determining whether extraordinary and

25   compelling reasons warranting compassionate release exist.  *See Aruda*, 993 F.3d at 802.  With

26   that framework in mind and recognizing that the policy statement does not bind the court, the

27   court discusses U.S.S.G. § 1B1.13 to the extent it informs the court's analysis.

28   */////*

The application notes to U.S.S.G. § 1B1.13 provide greater specificity with respect to the categories that qualify under the policy statement: defendant's medical condition (subdivision A), defendant's deteriorating health and age together (subdivision B), family circumstances (subdivision C), or "other reasons" (subdivision D). *See* U.S.S.G. § 1B1.13, cmt. n.1 (A)–(D). Relevant here, subdivision D states: "As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13, cmt. n.1 (D). As one district court has explained, subdivision D "acknowledges that there may be other situations which constitute extraordinary and compelling reasons and provides a non-specific blanket authorization for early release, labeled 'Other Reasons.'" *United States v. Beck*, 425 F. Supp. 3d 573, 578 (M.D.N.C. 2019). Although subdivision D states that the BOP makes the determination regarding the existence of "other reasons," courts have recognized that they may independently assess whether "other reasons" exist because the applicable policy statement has not been amended since the enactment of the FSA, which authorizes defendants—not just the BOP—to bring motions pursuant to 18 U.S.C. § 3582(c). *See id*; *United States v. Parker*, 461 F. Supp. 3d at 981 ("Pursuant to the FSA, the amended § 3582(c)(1)(A)(i) vests courts with independent discretion to determine whether there are extraordinary and compelling reasons to reduce a sentence.") (internal quotations omitted).

As summarized above, in 1995, defendant was convicted of several serious drug trafficking offenses, including the manufacturing of approximately 224 pounds of methamphetamine over the three years that he operated his criminal enterprise. (Doc. Nos. 322; 327.) The presentence report determined that defendant's lack of prior criminal history placed him in category I and that his total offense level was 43, therefore calling for a life term of imprisonment under the mandatory sentencing guidelines in effect in 1994. (PSR at 18.)

/////

/////

/////

/////

19

1    Specifically, the presentence report stated as follows:

2         The recommended guideline range in this case is life.  Absent a
          departure, it does not appear the Court has any option but to commit
3         the defendant to the Bureau of Prisons for life.  In this case, this
          officer believes that sentence is appropriate.  The defendant was an
4         organizer and leader of a conspiracy in which huge amounts of
          methamphetamine were manufactured and distributed to the public.
5         He operated numerous laboratory sites in different cities in the state
          of California.   The untold harm to the public because of the
6         defendant's actions is incalculable.  Based on the facts of this case,
          it is this officer's belief that society needs to be protected from this
7         individual for the rest of his life.

8         Based on the aforementioned, it appears the only applicable sentence
          in this case would be life imprisonment, and that will be the
9         recommendation.

10   (PSR at 18, ¶¶ 82, 83.)

11        Defendant Favela urges this court to now find that "other reasons" warranting his

12   compassionate release exist based on the fact that if he were sentenced today, "in a post-*Booker*

13   advisory guideline landscape," his sentence "would be lower for the simple reason that an offense

14   such as his—one involving only methamphetamine, with no allegations of violence, for a first-

15   time offender without any criminal history—would not be punished with a life term," and that

16   "post-*Booker*, this Court would have discretion to vary below a life term."  (Doc. No. 609 at 10)

17   (citing *United States v. Booker*, 543 U.S. 220 (2005)).  Defendant emphasizes that because the

18   sentencing guidelines were considered to be mandatory when he was sentenced back in 1995, "no

19   sentencing judge affirmatively decided that [he] truly deserved a life sentence as his first prison

20   term."  (Doc. No. 609 at 10.)  In support of his argument, defendant Favela cites to the district

21   court's decision in *Parker* which found extraordinary and compelling reasons existed in that case

22   to reduce the defendant's life sentence to "time served, followed by five years of supervised

23   release" in part because his life sentence was imposed under a sentencing regime that is no longer

24   /////

25   /////

26   /////

27   /////

28   /////

20

valid post-*Booker*.  (Doc. No. 622 at 9) (citing *Parker*, 461 F. Supp. 3d at 985–86).[10]  The district

court in *Parker* explained its independent assessment and reasoning as follows:

> In 2000, pursuant to the then-mandatory sentencing guidelines, the Court sentenced Parker to life imprisonment.  In 2005, the Supreme Court subsequently determined in *Booker* that insofar as the guidelines were mandatory, they were unconstitutional, rendering the guidelines "effectively advisory."  Courts have specifically recognized the significance of *Booker* where, pursuant to other provisions of the FSA, inmates have sought reductions of sentences imposed prior to *Booker*.  *See Jones*, 431 F. Supp. 3d at 747 ("The retroactive nature of the [FSA] provides long-awaited relief to those sentenced under the unconstitutionally imposed mandatory guideline ranges."); *accord United States v. Stanback*, 377 F. Supp. 3d 618, 625 (W.D. Va. 2019) ("The court finds that it has authority under 18 U.S.C. § 3582(c)(2) to modify Stanback's sentence, taking into account the advisory nature of the guidelines after *Booker* and the considerations set forth in 18 U.S.C. § 3553(a).").

*Parker*, 461 F. Supp. 3d at 981.

   The undersigned agrees with the reasoning employed by the district court in *Parker*.

Here, defendant Favela was sentenced to life imprisonment solely because the sentencing

guidelines were considered mandatory in 1995; the sentencing court had no discretion to impose

any other sentence absent a recognized ground for departure.  The undersigned further agrees that

like the defendant in *Parker*, defendant Favela "is currently serving life in prison, pursuant to a

judgment rendered under a sentencing regime that is no longer in effect and has since been

declared unconstitutional."  *Id.*  The court recognizes that the Sentencing Guideline range

applicable to defendant Favela has not been altered by the Supreme Court's *Booker* decision.

---

[10]  As defendant points out in his reply, the circumstances in *Parker* are similar to this case:

> Parker received an actual life sentence after being convicted of charges related to filing of false tax return and possession and distribution of cocaine.  [*Parker*,] 2020 WL 2572525, *1.  Under the then-mandatory guidelines, the district court "imposed a life sentence because of three enhancements . . . : (1) a two-level increase for possession of a dangerous weapon; (2) a four-level increase for being "an organizer or leader of a criminal activity that involved five or more participants"; and (3) a two-level increase for abuse of a position of trust." *Id.* [at] *3. . . . As with Mr. Favela, Mr. Parker offered evidence of rehabilitation—education, good job evaluation, no disciplinary incidents as documenting his rehabilitation during his 22 years in prison.  *Id.* [at] *11–12.

(Doc. No. 622 at 9.)

21

That is, even if defendant Favela were to be sentenced today, his total offense level would still be 43, and the applicable advisory sentencing guideline range would still be "life." But, importantly, imposition of a life sentence would no longer be *mandated* because the Sentencing Guidelines are no longer mandatory but are instead only advisory. *See United States v. Booker*, 543 U.S. 220 (2005) (declaring the Guidelines advisory). Indeed, nothing in the record before the court affirmatively suggests that the sentencing judge would have imposed a life term of imprisonment had such a sentence not then been mandatory. Moreover, as the court explained at the hearing on the pending motion, in the undersigned's many years of experience sentencing defendants in this heavily-impacted district, which carries some of the heaviest criminal caseloads in the country, the court has never imposed a sentence as long as the life sentence imposed on defendant Favela. Given the court's experience in this regard, and despite the fact that his applicable guideline range is still "life," the court agrees with defendant Favela that he would not be sentenced to a term of life imprisonment if he were to be sentenced today under contemporary standards. Notably, the total offense level of 42—one notch below defendant's level of 43—calls for a guideline range of "360 months to life," and as noted above, *supra* n.6, defendant Favela has already effectively served a term of 387.1 months, which is above the low end of that "360 months to life" guideline range. Under these circumstances, the court finds that defendant has satisfied his burden of demonstrating the presence of "other reasons" establishing the existence of extraordinary and compelling circumstances warranting a reduction in his life sentence.

In reaching this conclusion, this court joins other courts that have similarly found that changes in sentencing law—including the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220 (2005) that the U.S. Sentencing Guidelines are advisory and their application cannot be mandatory, coupled with enactment of the FSA—can constitute extraordinary and compelling reasons that warrant compassionate release. *See* e.g., *United States v. Jones*, No. 94-cr-20079-EJD, 2020 WL 5359636, at *7 (N.D. Cal. Aug. 27, 2020) (finding that "changes in sentencing law weigh strongly in favor of compassionate release" where "Mr. Jones was sentenced under a regime that has not only been held unconstitutional but has also been substantially amended to eliminate the brutal harshness of stacking"). In *Jones*, for instance, the district court emphasized

1    that the severity of the defendant's sentence (29 years and 9 months incarceration after pleading

2    guilty to armed robbery in 1994) was a result of the sentencing court "stacking" the then-

3    mandatory sentences for counts of using a firearm in furtherance of a crime of violence in

4    violation of 18 U.S.C. § 924(c)—a practice that was eliminated by the FSA. *Id.* at *6. The

5    district court in *Jones* noted the gross disparity between that sentence—which the sentencing

6    court had no choice but to impose—and the fact that today, the defendant would probably be

7    sentenced to "14.75 years imprisonment, if not less." *Id.* at *7. At the time of the defendant's

8    motion in *Jones*, he had already served over 25 years in prison, more than half his life. *Id.* Under

9    those circumstances, the district court concluded that "Mr. Jones's continued incarceration is

10   unjust" and joined "the growing majority of courts in holding that the 'sea changes' in sentencing

11   law wrought by *Booker* and the FSA, . . . , weigh strongly in favor of reducing Mr. Jones's

12   sentence." *Id.* (citing cases).

13          Indeed, in light of recent Supreme Court and Ninth Circuit precedent, this court must

14   consider the changes in sentencing laws when ruling on the pending motion.[11] The Ninth Circuit

15   has now held that in light of the Supreme Court's decision in *Concepcion*, courts must consider

16   "non-retroactive changes in sentencing law" when evaluating compassionate release motions

17   brought under § 3582(c)(1)(A). *See Chen*, 2022 WL 4231313, at *8 (citing *Concepcion*, 142 S.

18   Ct. at 2396) ("remand[ing] for the district court to reassess whether extraordinary and compelling

19   reasons exist when considering non-retroactive changes in sentencing law, in combination with

20   other factors particular to Chen's case," because "[t]he district court erred when it declined to

21   consider § 403(a)'s non-retroactive changes to § 924(c) stacked sentencing when evaluating

22   Chen's motion for compassionate release."); *see also United States v. Gonzalez*, No. 8:07-cr-

23   00202-DOC, 2022 WL 4119401, at *2 (C.D. Cal. July 11, 2022) (denying a motion for

24   compassionate release as to a defendant sentenced to a 240-month term of imprisonment, despite

25   _____

26   [11] In its opposition brief, the government did not address defendant's arguments regarding
     whether changes in federal sentencing law post-*Booker* constitute extraordinary and compelling

27   reasons warranting his compassionate release. At the June 30, 2021 hearing, the government
     conceded that the court has the discretion to consider such changes and to reduce defendant's

28   sentence, though the government urged the court to not do so in this case.

23

the change of the applicable "mandatory minimum prison sentence" "from 20 years [240 months] to 15 years" since the original sentencing, because the defendant's initial sentence was not based solely on the mandatory minimum and "[w]ere the Court to resentence Defendant today with the new mandatory minimum, the Court would impose a sentence within the Guideline range of no fewer than 240 months.").

Accordingly, the court concludes that defendant Favela has met his burden of demonstrating that "other reasons" exist constituting extraordinary and compelling reasons for the granting of compassionate release in his case under § 3582(c)(1)(A).

## C.      Consistency With the § 3553(a) Factors

Finally, any relief to be granted pursuant to 18 U.S.C. § 3582(c)(1)(A) must be consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a).[12]  *See Parker*, 461 F. Supp. 3d at 979. Here, consideration of the § 3553(a) sentencing factors support defendant Favela's release at this time.

Defendant argues that the relief he seeks—a reduction of his sentence to time served—is consistent with consideration of the § 3553(a) factors because:  (1) he has demonstrated his rehabilitation, (2) he does not pose a danger to the public if he is now released from prison, and (3) he has effectively served a prison term of over 30 years, which is sufficient punishment for his offense.  (Doc. Nos. 609 at 6–7, 10–11; 622 at 10–13.)

As to his rehabilitation, defendant emphasizes that he has suffered no disciplinary issues or convictions in prison and "[t]hough he is serving a life sentence, he has embraced prison as a

---

[12]  Title 18 U.S.C. § 3553(a) provides that, in determining the sentence to be imposed, the court shall consider:  the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public from further crimes of the defendant and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

place for rehabilitating himself through education, spiritual growth, and making amends to

society by giving back to the community," including by volunteering his time and money to

crochet stuffed animals for donation to the local children's hospital.  (Doc. No. 609 at 6.)

Reviews provided by defendant's BOP case manager and counselor attest to his exemplary

conduct in prison, noting that defendant Favela "is respectful of staff and peers," "is being very

productive with his time while incarcerated," "maintain[s] a sense of accountability to self and to

others through attention to the potential impact (short and long) of actions," "seek[s] to engage in

behaviors which reflect pro-social values thus creating a positive impact in their life and the lives

of others," and "display[s] a healthy tolerance for delayed gratification."  (Doc. Nos. 609 at 7;

609-3 at 32.)  Defendant argues that these reviews are strong evidence of his rehabilitation over

the course of his imprisonment because he earned them at a time when he had no expectation of

being released from prison.  (Doc. No. 609 at 7.)  The government does not dispute defendant's

purported rehabilitation, but rather asserts that even if defendant is a model inmate, "there is a

significant difference between doing well in prison and doing well in society," and rehabilitation

"is not, by itself, an extraordinary and compelling reason."  (Doc. No. 615 at 14.)  The court

agrees with the government that rehabilitation alone is an insufficient basis upon which to grant

compassionate release.  *See* 28 U.S.C. § 994(t); U.S.S.G. § 1B1.13, cmt. n.3.  Nonetheless,

impressive rehabilitation efforts such as those present in this case are obviously a relevant

consideration which, in this case, supports the granting of relief.

      As to whether defendant poses a danger to the safety of others, defendant argues that he

does not because he has demonstrated rehabilitation during his nearly 29 actual years in prison,

and had suffered no criminal convictions before he was sentenced to life imprisonment in this

case in 1995.  (Doc. No. 609 at 6–7, 10.)  The government argues that the nature and

circumstances of defendant's criminal offense show that he would be a danger to the community

if he is released.  (Doc. No. 615 at 13.)  In particular, the government contends that the

presentence report reflects that defendant "armed those that worked in his laboratory at the

Millwood ranch where several of his workers were arrested," and concludes that "a life sentence

was (and is) appropriate because Favela organized and led a conspiracy in which hundreds of

1   pounds of methamphetamine were manufactured and distributed to the public," noting that "it is

2   this officer's belief that society needs to be protected from this individual for the rest of his life."

3   (Doc. No. 615 at 13.)

4           In reply, defendant Favela contends that although the presentence report stated that

5   "agents found three rifles and an assault rifle in the bedroom of the Millwood Ranch home," the

6   report does not state that anyone attempted to access those weapons during the law enforcement

7   raid that led to arrests that day.  (Doc. No. 622 at 10) (citing PSR at 2).  In addition, defendant

8   contends that "[w]hile his was an elaborate and lengthy drug operation, there is no mention of

9   [him] committing or attempting to commit any act of violence in this case," and his "offense did

10  not involve him ever threaten[ing] anyone with a firearm or us[ing] a gun during a drug

11  transaction."  (Doc. No. 622 at 10, 11.)

12          The court recognizes the seriousness of defendant's offense and agrees that the nature of

13  this offense is one that evinces a danger to the safety of others and the community.  The presence

14  of firearms at the methamphetamine manufacturing location and in defendant's home clearly

15  heighten those legitimate concerns.  Nonetheless, the court is persuaded that defendant Favela no

16  longer poses a danger to the public in light of his demonstrated rehabilitation over the last nearly

17  29 actual years in prison, including his exemplary record of having suffered no prison disciplinary

18  infractions, the fact that nothing in his record suggests that he has been violent, and that he did

19  not have any prior criminal history before the extremely serious criminal conduct leading to his

20  current imprisonment.  *Cf. United States v. Barry House*, No. 14-cr-00196-CRB-1, 2020 WL

21  2557031, at *2 (N.D. Cal. May 20, 2020) (concluding that defendant posed a danger to the

22  community if he were released despite some evidence of his rehabilitation and no disciplinary

23  problems while detained in the year leading up to his sentencing because defendant had an

24  extensive criminal history, including violent offenses, and the court had significant concerns

25  regarding the risk of recidivism in his case).

26          Defendant Favela contends that a reduction of his sentence to time served at this point

27  would not diminish the seriousness of his offense of conviction.  (Doc. No. 622 at 13.)

28  Specifically, defendant argues that with consideration of good conduct credits, he has effectively

26

served a term of imprisonment of approximately 387.1 months (nearly 33 years), and that stands as a very significant and sufficient punishment for his crimes.  (Doc. No. 622 at 13.)  In the undersigned's view, a nearly 33-year sentence does reflect the seriousness of defendant's offense, is sufficient to promote respect for the law, and provides just punishment while also affording adequate deterrence to criminal conduct.  *See* 18 U.S.C. § 3553(a)(2)(A), (B).

In addition, as defendant Favela notes in his supplemental brief, the docket in this case reflects that four of his co-defendants were also sentenced to terms of imprisonment, and none of those co-defendants remain in BOP custody today.  (*See* Doc. No. 643.)  Specifically, according to the docket and the BOP's inmate locator website, co-defendant Ignacio Acosta-Torrez was sentenced to a 360-month term of imprisonment and was released on September 29, 2015; co-defendant Norberto Franco-Arroyo received a 292-month term of imprisonment and was released from confinement on May 20, 2015; co-defendant Francisco Carbajal-Arias also received a 292-month term and was released from custody on May 22, 2015; Ramiro Gonzalez-Ramirez received an 84-month term of imprisonment and was released from imprisonment by 2008; and defendant Benjamin Corral was sentenced to a 292-month term of imprisonment and was released on August 19, 2015.  (*See id.*)  Thus, granting defendant Favela's requested relief would not result, in the undersigned's view, in a sentencing disparity among his co-defendants because he has already served a term of imprisonment significantly longer than the terms of imprisonment served by his co-defendants—an appropriate result given defendant Favela's greater level of culpability as a leader and organizer of the drug trafficking conspiracy.

Finally, that defendant Favela is serving a life sentence of imprisonment does not preclude his compassionate release.  Even before the COVID-19 pandemic, courts recognized that circumstances may warrant the granting of compassionate release even in the case of prisoners serving life sentences.  *See United States v. McGraw*, No. 2:02-cr-00018-LJM, 2019 WL 2059488, at *1–2 (S.D. Ind. May 9, 2019) (ordering the compassionate release of a defendant who had served 16 years of his life sentence following his conviction for conspiracy to possess with the intent to distribute and distribution of 20 pounds of methamphetamine, and was now 72 years old and suffering from diabetes, hyperlipidemia, emphysema, stage three kidney disease,

and hepatitis C); *United States v. Mondaca*, No. 89-cr-0655 DMS, 2020 WL 1029024, *8–9 (S.D. Cal. Mar. 3, 2020) (ordering the compassionate release of a defendant who had served at least 10 years of his sentence of life without parole pursuant to his conviction for conspiracy to possess with the intent to distribute 33 pounds of cocaine, was now 77 years old, suffered from a deterioration in physical health, and was "increasingly vulnerable to victimization within the correctional facility").

Accordingly, for these reasons, the court finds that the granting of defendant's motion for compassionate release is consistent with the sentencing factors set forth in §3553(a).

## CONCLUSION

For the reasons explained above, the court concludes that defendant Favela has demonstrated that "extraordinary and compelling reasons" exist warranting his compassionate release from prison.  Moreover, the court finds that the granting of release at this time is consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a).  The previously imposed sentence of concurrent terms of life imprisonment is therefore now reduced to a sentence of time served pursuant to 18 U.S.C. § 3582(c)(1)(A).

According to the government, defendant Favela is currently subject to an immigration hold and will be removed to Mexico upon his release from imprisonment.  (Doc. No. 615 at 15.) According to defendant Favela's understanding, an immigration judge has already entered an order formally directing that he be deported to Mexico.  (Doc. No. 643 at 1.)  Defendant Favela plans to reside with his son, Eduardo, in Tijuana, Mexico.  (Doc. No. 609-2.)  Therefore, in granting the pending motion for a reduction in the defendant's sentence, the court will also now impose a lifetime term of supervised release, that will become unsupervised if he is deported as expected.

Accordingly:

1.      Defendant's motion for compassionate release (Doc. Nos. 607, 609) is granted;

2.      Defendant's sentences on Counts 1 through 6 of life terms of imprisonment to be served concurrently, are reduced to a sentence of time served as to each of those counts; and

28

3.     The Court finds that a term of supervised release is now appropriately imposed and will adequately address the seriousness of defendant Favela's offense and the need for the original sentence imposed while balancing the extraordinary and compelling circumstances that warrant defendant Favela's compassionate release.

    a.     Therefore, upon release from imprisonment, defendant Guadalupe Favela shall be placed on supervised release for a term of Life on Count 1 and Counts 3, 4, and 6, to run concurrently for a total term of Life, with the term of supervised release becoming unsupervised if he is deported. Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report telephonically to the probation office in the district to which he is released.

    b.     While on supervised release, the defendant shall not commit another federal, state, or local crime and shall not illegally manufacture or possess controlled substances.  The defendant shall cooperate in the collection of DNA as directed by the probation officer and shall comply with the standard conditions which have been recommended by the United States Sentencing Commission and adopted by this Court (see attached).

    c.     Further, the defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed four (4) drug tests per month.

    d.     The defendant must submit his person, property, house, residence, vehicle, papers, computer, other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer or any law enforcement officer under the immediate and personal supervision of the probation officer, based upon reasonable suspicion of unlawful conduct or a violation of a condition of supervision, without a search warrant.  Failure to submit to a search may be grounds for

29

revocation.  The defendant must warn any other occupants that the premises may be subject to searches pursuant to this condition.

e.   If the defendant is deported, excluded or allowed to voluntarily return to his  country of origin, he must remain outside the United States, unless legally authorized to re-enter.  If the defendant re-enters the United States, he must report to the nearest probation office within 72 hours after his return; and

f.   As noted, supervision is waived upon deportation, exclusion, or voluntary departure.

IT IS SO ORDERED.

Dated:  **September 22, 2022**        _____

UNITED STATES DISTRICT JUDGE

30